**In re Carmel Dale CUTBIRTH & Joyce Roberta Cutbirth, Debtors.**

**Bankruptcy No. 86–03846–S–2–13.**

United States Bankruptcy Court, W.D. Missouri, S.D.

Jan. 26, 1987.

Fred Charles Moon, Springfield, Mo., for Bank of Gainesville.

Gary A. Love, Springfield, Mo., for debtors.

### MEMORANDUM OPINION

FRANK W. KOGER, Bankruptcy Judge.

Debtors filed their petition and plan under Title 11, Chapter 13 on September 2, 1986. The Bank of Gainesville filed its proofs of claim, rejection of the plan and objections to the plan on October 14, 1986, and conducted a Rule 2004 examination of debtors. There were several thrusts to the Bank's objections but primarily they can be summarized into the compartments of: (1) non good faith, (2) underevaluation of the Bank's collateral, (3) lack of feasibility of the plan, and (4) receipt of less under the plan than by liquidation. Obviously most of the issues commingled and will be addressed as a whole.

The Bank had four notes issued by debtors. The latest was secured by a hay rake—balance $998.05 plus $14.95 interest to date of filing. The next latest was unsecured—balance $1,175.09 plus $94.92 interest to date of filing. The third latest was secured by steers and calves—balance $1,995.00 plus $99.01 interest to date of filing. The oldest and in reality most important note was dated April 28, 1983, secured by cattle, equipment, assignment of leases, general intangibles, and basically all of the personal property assets that go to the composition of an operating dairy herd. UCC1s had been duly filed and there is no dispute as to the validity of the Bank's secured posture. Instead the struggle was over three basic points:

   (1) What was the value of the debtors' property;

   (2) What of debtors' property was liened to the Bank;

   (3) Did debtors' conduct indicate a bad faith filing?

The first point is the easiest. Debtors' schedules had listed the value of what they called the Bank's cattle at $13,500.00 and all other cattle at a value of $10,500.00. They listed the value of the Bank's milking equipment at $3,000.00. They did not list the hay rake. They indicated the Bank was undersecured by $39,769.26 and proposed to pay thereon 10 cents on the dollar. The Bank's expert witness, Ray Jones, on the other hand viewed the entire cattle herd at $69,075.00 after his count and appraisal made December 10, 1986. Mr. Jones was the Executive Vice President of the Bank (a not inconsiderable factor in evaluating his testimony) but also was clearly qualified to evaluate the assets. Mr. Jones valued the milking equipment (which had cost $24,000.00) at $15,000.00 "retail" but was adamant it could be sold in a fairly expeditious manner for $10,000.00 to $12,000.00. Mr. Jones also opined that two leases of real estate and the appurtenances thereon

were worth $5,650.00 per year—they had 18 months to run at the date of filing—and thus would have had a value of $8,425.00 at that date.

Debtors' evidence was considerably different from their sworn schedules, and although somewhat confusing totalled in excess of $40,000.00. Debtors were still of the opinion that the milking equipment was worth only $3,000.00 and the heretofore forgotten rake was worth only $600.00. Debtors never came to any definite opinion on the value of the two leases.

The Court ruled the cattle to have a value of $51,807.00 at the date of filing, the equipment to have a value of $10,000.00 and the rake to have a value of $750.00. The Court found that the leases had minimal value.

The second point is somewhat more convoluted. All witnesses agreed that on or about April 23, 1983, debtors had in possession: 54 Holstein cows 3–6 years old; 11 Holstein heifers 400 to 600 pounds; 11 Holstein, bucket to 300 pound, heifers; 11 Holstein bull calves, which were also bucket to 300 pounds in size; and one Holstein Bull. There was substantial accord by all witnesses that on December 10, 1986, there were in the debtors' possession: 71 to 73 Holstein cows; 8 to 9 Holstein breeding size heifers; 10 Holstein, 200 to 400 pound, bull calves; 3 cross bred heifers; 10 Holstein, 30 day old to 3 month old, bull calves; 1 cross bred, 150 pound, heifer; 11 Holstein or cross bred, 100 to 200, pound calves and at least 1 bull. The Bank's total number of animals was 143. The debtors, who enumerated the animals in a different fashion appeared to contend that the Bank had 83

head and that there were 68 other head of cattle to which the Bank had no claim.

That distinction led directly to the divergent opinions as to what the Bank had a lien on. The Bank, as might be expected, relied on its after-acquired property clause. The contention of both debtors and by Francis Huff, a neighbor, can be summarized as follows: In June or July of 1983, Francis Huff and his wife decided to help the debtors. Mr. Huff bought 20 Holstein Springer Heifers which were about ready to calve and had them delivered to the debtors' premises. Although nothing was committed to writing at that time, the oral agreement between the Huffs and the debtors was that this was a lease. The debtors were to pay the Huffs $15.00 per head, per month, and to give to the Huffs all of the calves born of said heifers. The lease was to terminate in six years. At that time the debtors were to return the survivors of the 20 heifers and any previously undelivered offspring to the Huffs. For no convincingly good reason, the parties in June or July of 1986 had memorialized this agreement in a one page, handwritten agreement which again, for no convincingly good reason, they had chosen to date June 3, 1983.

Cross examination on this much of the debtors' explanation revealed that from 1983 to date, the debtors had never paid the Huffs one penny under the agreement, the Huffs had never received a calf, and the Huffs had never expressed any concern or made any demand.

From this base, the debtors then testified that the following attributions of their livestock was correct:

| Bank's Property | | Huff's Property | |
|---|---|---|---|
| 37 | cows | 36 | cows |
| 6 | bred heifers | 2 | bred heifers |
| 11 | heifer calves | 9 | heifer calves |
| 11 | 4 to 11 month calves | 12 | 4 to 11 month calves |
| 17 | little calves | 9 | little calves |
| 1 | bull | | |
| 83 | | 68 | |

Since neither side presented any explanation as to why the Bank's count of 143 on December 10, 1986, had now grown to 151, the Court attributes the difference to be explainable through the birth of calves or someone simply miscounting or being confused as to the count.[1]

As this explanation unfolded, the Court could not help recalling a memorable quote from The Honorable John Pearson, Bankruptcy Judge in Wichita, Kansas, who said: "The coyotes only ate the Bank's sheep." Certainly the debtors' suggestions as to why the Huffs' base herd of 20 springer heifers had increased to 68 while the Bank's base herd of 76 female animals was now only 82 in number, not to mention the Bank's indefatigable bull, was unsatisfactory. This was particularly true because the Bank introduced debtors' tax returns. The Schedule F's contained therein showed no claim for cows or calves stolen, lost through death, or otherwise suffering terminal misadventure. Likewise the debtors could only recall sales of 22 animals in the 1983–1986 time frame.

Because of the Court's ruling, the apparent disparity is not of great importance. Based on the evidence presented, the Court ruled that the Bank had a security interest in all of the cattle and that same was not subordinated to the Huffs' rights (if any) in any cattle. Debtors had argued that the Bank knew the Huffs were involved and the Bank did not deny it but argued they never knew the extent or ramifications of said involvement.

The third point and fourth points the Court reserved ruling on, giving the debtors fifteen (15) days to file amended schedules and an amended plan but indicating that if same were not done the Court would rule that the plan was not filed in good faith and would issue such other orders as to bring the proceedings to a conclusion.

The parties then requested the Court to issue a formal opinion with findings of fact. The Court's findings are:

(1) Debtors are indebted to the Bank on four notes as follows:

| | | |
|---|---|---|
| 4–28–83 | $61,198.80 plus interest $643.80 cattle, equipment and leases | |
| 10–21–85 | $ 1,995.00 plus interest $ 99.01 steers and calves | |
| 4–18–86 | $ 1,175.09 plus interest $ 94.92 unsecured | |
| 4– 2–86 | $ 998.05 plus interest $ 14.95 85' New Holland Hay Rake | |

(2) Said debts were secured by the collateral outlined herein.

(3) The Bank's security interests were duly perfected.

(4) The value of the hay rake is $750.00.

(5) The value of the equipment is $10,000.00.

(6) The value of the dairy animals, in total, is $51,807.00.

(7) There was no substantial change in value in any of the assets from date of filing to date of hearing.

(8) The oral lease, even if as alleged, could not be given effect because of Mo. R.S. 432.010.

(9) The Court could not believe the evidence as to the lease or the cattle distribution.

(10) The Bank had an after acquired property clause in their security agreement and same was revealed in the perfecting UCC1s.

(11) The assignments of lease have and had only minimal value.

(12) The debtors in repeated financial statements given to the Bank never denominated or distinguished any of their cows as belonging to the Huffs.

(13) In each financial statement given to the Bank the debtors listed all the cattle present on their premises.

---

1. Perhaps the above table cannot be appreciated without understanding that when a bovine animal is born, it is a calf for its first year. Then it is usually demonstrated as a yearling or a heifer, or a steer since few bull calves reach the age of one year without being castrated. Heifers are usually bred at about 18 to 24 months of age. The gestation period is nine months. The bred heifers are commonly called springer heifers and calve at 27 to 33 months.

(14) The Bank never knew of the claimed extent of any interest of the Huffs in the cattle.

(15) The cattle purchased by the Huffs, together with their increase, are subject to the Bank's lien.